**Dennis FITZGERALD and Essie Fitzgerald, Plaintiffs,**

v.

**L & L TRUCK BROKERS, INC., Defendant.**

**No. PB–C–97–249.**

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

Jan. 21, 1999.

John W. Walker, Little Rock, AR, O. Jerome Green, Little Rock, AR, for plaintiffs.

J.W. Green, Jr., Green & Henry, Stuttgart, AR, for defendant.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, District Judge.

Plaintiff Dennis Fitzgerald, an African–American, is an independent truck operator who resides in Jefferson County, Arkansas. He brings this action pursuant to 42 U.S.C. § 1981, contending that defendant discriminated against him on the basis of his race in assigning hauling runs. He further contends that after complaining of the discriminatory treatment, defendant retaliated against him.[1]

L & L Truck Broker, Inc., operates a truck brokering business in Stuttgart, Arkansas. Teresa Shirkey is the President and sole stockholder of the corporation. She, along with Linda Jean Simpson, are dispatchers. Defendant also employs a bookkeeper and a secretary. All four of defendant's employees are white. Defendant arranges for the movement of cargo or freight through independent contractors such as plaintiff.

Plaintiff is the owner of two trucks. He and his wife, Essie Fitzgerald (hereinafter Essie) worked as independent contractors for defendant. Plaintiff began driving on a part-time basis for defendant in 1995, and became a regular or full-time driver in April of 1996. Plaintiff's wife began driving truck in July of 1996.

In the ordinary course of the truck brokering business, when a farmer or shipper has grain or grain products to move he or she will contact defendant who, in turn, will find a trucker for the purpose of hauling the shipper's produce. The trucker pays a commission to defendant for locating the hauls. The commission ranges from eight percent to ten percent of the truck income generated by the haul depending on the type of truck. Local hauls are those from farm to mill, mill to mill, or mill to barge. Long hauls are considered as over-the-road hauls of finished products such as cleaned, bulk or packaged rice.

---

1. The complaint originally named Dennis Fitzgerald and Essie Fitzgerald as plaintiffs. Essie Fitzgerald has moved to dismiss her complaint. The Court grants the motion.

In addition to providing local hauls and long distance hauls, defendant also provides a group of trucks to Riviana Foods in Carlisle, Arkansas. These trucks are referred to as "dedicated trucks," that is, they are dedicated to the hauls created by and for Riviana. The dedicated trucks are owned by persons living near so that they can be called upon at any time to haul to places required by Riviana.

In 1995, plaintiff requested that he be placed on the list of truckers to which defendant would, from time to time, broker hauls. To become eligible to receive brokered truck loads from defendant, plaintiff completed certain tax forms and provided a certificate of liability insurance and a certificate of cargo insurance. Both the insurance certificates limited plaintiff's insurance coverage to hauling within a radius of 200 miles from Pine Bluff, Arkansas. In March or April, of 1996, plaintiff began to drive full-time for defendant.

Defendant does not have any trucks of its own. It has a pool of between 75 and 125 truckers who haul loads on a regular or part-time basis. In 1995, 45 of the truckers were African–American, in 1996 and in 1997, sixty of the truckers were African–American.

There are no written regulations or policies for assigning runs. The assignment of runs is left totally to the discretion of the dispatcher. Both Simpson and Shirkey testified that several factors entered into the assignments—including seniority and work performance. Defendant's usual practice is to assign the better truck runs to its regular drivers unless work orders are so heavy that they require the use of part-time drivers as well. However, there are no hard and fast rules concerning assignments.

Plaintiff contends that L & L assigned better hauls to white drivers, particularly during the slower work periods. He argues that he made less money than white drivers with less seniority.

On January 11, 1997, Plaintiff and Essie complained to Shirkey about being assigned lower paying runs. Shirkey told plaintiff and Essie that she would speak to Simpson about the assignments.

On January 13, 1997, Simpson assigned plaintiff and Essie a run from Pine Bluff to Stuttgart. After making one trip with each of his trucks from Pine Bluff to Stuttgart along with two other African–American truckers, Dennis Qualls and Nathaniel Hughes, plaintiff complained to Simpson. Plaintiff wanted the Pendleton–Stuttgart run, which he considered more profitable. Plaintiff turned in his invoices for the two loads he and Essie had hauled from Pine Bluff and Stuttgart and refused to make any further loads from Pine Bluff. Both Simpson and Shirkey felt that the load assigned plaintiff was profitable, and that plaintiff was not justified in refusing to accept the haul. They also stated that the failure to assign plaintiff the Stuttgart to Pendleton haul was not based on race. On January 13, 1997, 23 trucks were on that haul, ten of which were run by African–American operators, twelve by white operators and one by a white owner with an African–American operator.

Plaintiff contends that after complaining in January, Simpson did not offer him as many hauls as other truckers, both African–American and white. He believed that the discrimination continued. Essie testified that from January 14, 1997 to January 22, 1997, she saw white truck drivers working in areas where plaintiff could have worked, doing hauls that plaintiff should have been given. Plaintiff was not given work during that period of time. He determined that defendant was not going to remedy what he viewed as a discriminatory situation and he decided to file a charge with the Equal Employment Opportunity Commission (EEOC). That charge, filed around January 23, 1997,[2] alleged race discrimination and retaliation.

Plaintiff asserts that after defendant received the EEOC charge, Shirkey and Simpson continued to retaliate against him. He states that he was offered fewer hauls that other drivers. Finally, after an incident on March 18, 1997, (discussed *infra*), defendant stopped giving him any more runs. In essence, defendant unilaterally terminated their relationship.

**2.** The EEOC Charge has a date stamp which is not legible, but the parties in their proposed findings state that the Charge was filed on January 23, 1997.

*Race Discrimination*

■ Section 1981 provides that all persons "shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." In response to the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), Congress included in the Civil Rights Act of 1991 a subsection to § 1981 defining the phrase "make and enforce contracts." The phrase "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Thus, § 1981 applies to discriminatory acts occurring in the performance of contracts, not just acts that result in changes to the contractual relationship. *See Patterson v. Augat Wiring Systems, Inc.*, 944 F.Supp. 1509, 1519 (M.D.Ala.1996).

■ A section 1981 discrimination claim is analyzed in the same manner as claims brought under Title VII of the Civil Rights Act. To establish a prima facie case of race discrimination, plaintiff must establish that he is a member of a protected class, that he was performing according to defendant's legitimate expectations, that he suffered an adverse contractual action, and that similarly situated white individuals were treated more favorably. *See Bratton v. Roadway Package System, Inc.*, 77 F.3d 168, 176 (7th Cir.1996).

There does not appear to be any dispute that plaintiff and defendant had a contractual relationship, that is that plaintiff would make hauls and that defendant would receive a percentage (generally eight percent) of the money plaintiff earned as a broker's fee.

■ Plaintiff attempted to demonstrate discrimination through comparison of earnings. The evidence submitted, i.e., the 1099 forms, do not support that similarly situated white truck owners were earning significantly more than plaintiff. A number of the white truckers were not similarly situated. That is, they did "over the road" hauls, which were more profitable than the shorter hauls

to which plaintiff was limited. A number of drivers were what are termed "dedicated drivers," that is, they hauled on a regular basis for a particular company.[3]

The evidence also reveals that the white drivers whom plaintiff contends had less seniority than he did actually had more seniority. Only Steele Boyd grossed more. However, factors other than race, account for the difference The top income producers also had more or different types of trucks. Thus, the Court cannot find that the white truckers, who earned more, were similarly situated.

Plaintiff discussed three incidents where he contends whites received more profitable hauls. For example, on one occasion, plaintiff felt that he should have been permitted to make additional hauls to a barge in Pendleton because his trucks were the first to unload that morning. While he and Essie were preparing to make a third haul, Simpson diverted them to Pine Bluff to load and haul to Stuttgart. He later went to defendant's office and confronted Simpson. She told him that another trucker had been assigned to make the load to the barge because the other trucker had not had the opportunity that day to make a load.

The Court is not persuaded that the incidents described by plaintiff demonstrate that defendant discriminated against him on the basis of race. In each incident, factors other than race accounted for the difference in earnings or the assignment of a particular run.

Plaintiff points to the discretion the dispatchers had in assigning hauls as evidence of discrimination. Again, there is not sufficient evidence to support that Simpson or Shirkey were assigning better hauls to white employees. Furthermore, plaintiff offered no support for his unsubstantiated assertion that he and Hughes were removed from hauling assignments to less profitable assignments so that whites could be given the more profitable ones.

---

3. Plaintiff contends that the failure to offer him dedicated runs or the long hauls was discriminatory. Plaintiff, however, never requested the longer hauls and his insurance certificates limited coverage to a 200-mile radius from Pine Bluff, Arkansas. In addition, the trucks dedicated to the Riviana mill were hauling though defendant long before plaintiff entered the trucking business.

Plaintiff refers to what he perceives as a "racially hostile atmosphere." He contends that the African–American truckers were required to call Simpson "Ms. Jeannie." Simpson stated that while this was true, she did not require that anyone refer to her in any particular way. The Court, therefore, cannot find that the difference in how African–Americans addressed Simpson was evidence on racially hostile environment. At the most, it evinces a preference by the particular drivers as to what they want to call Simpson.

Plaintiff's own actions refute his assertion of a racially hostile environment. Plaintiff "recruited" two African–Americans, Dennis Qualls and Nathaniel Hughes, to drive for defendant. Plaintiff recommended defendant to Qualls in the summer of 1996 and Hughes in December of 1996, as a good place to work. Furthermore, plaintiff himself testified that the events he was complaining about in 1996 were minor. He really couldn't complain about the majority of assignments.

The Court is not persuaded that plaintiff has established that defendant discriminated against him on the basis of race in the hauling assignments.

*Retaliation*

A number of courts have held that section 1981 encompasses allegations of retaliatory conduct in the racial discrimination context. *Evans v. Kansas City, Mo. School Dist.*, 65 F.3d 98, 101 (8th Cir.1995), *cert. denied*, 517 U.S. 1104, 116 S.Ct. 1319, 134 L.Ed.2d 472 (1996). *See also Hawkins v. 1115 Legal Service Care*, 163 F.3d 684, 693 (2d Cir.1998). *See also Patterson v. Augat Wiring Systems, Inc.*, 944 F.Supp. 1509, 1520 (M.D.Ala.1996) (discussing cases); *Thomas v. Exxon, U.S.A.*, 943 F.Supp. 751, 762 (S.D.Tex.1996), *aff'd*, 122 F.3d 1067 (5th Cir. 1997) (same). Although the legislative history of section 1981(b) refers to retaliation in the context of employment discrimination,, there is no reason to assume that Congress intended to limit such claims to the employ-

ment context.[4] Section 1981 covers any type of contractual relationship, not just the employment relationship. Thus, section 1981 should also encompass "allegations of retaliatory conduct" in the broad context of racial discrimination. *See Evans v. Kansas City, Mo. School Dist.*, 65 F.3d 98, 101 (8th Cir. 1995).

To establish a prima facie case of retaliation, plaintiff must establish that he participated in a statutorily protected activity, an adverse action occurred, and a causal connection between the protected activity and the adverse action. Plaintiff need not establish that discrimination actually existed; he need only establish that he had a reasonable belief that discriminated practices existed. Furthermore, plaintiff must demonstrate that his opposition to the unlawful activity was a motivating or determining factor in the adverse action taken by defendant. *See Thomas*, 943 F.Supp. at 763.

Plaintiff complained of unfair work assignments during the summer of 1996, and again in December, 1996 and January, 1997. Although the Court has found insufficient evidence of race discrimination in the assignment of runs, the Court cannot find that plaintiff's belief of discriminatory treatment was not reasonable. He had observed less senior white truckers working what he considered more profitable runs. Furthermore, after complaining on January 13, plaintiff did not receive any further assignments before filing the EEOC charge. Plaintiff's first assignment after January 13, was on January 29. Thus, plaintiff could reasonably believe that defendant was discriminating against him and retaliating against him for complaining.

There is perhaps some question as to whether Shirkey or Simpson thought that plaintiff was complaining of racially discriminatory treatment when he complained in the early part of January. Both Shirkey and

4. The House Committee on Education and Labor, in discussing the addition of subsection (b), the provision defining the phrase "make and enforce contracts" stated:

"The Committee intends this provision to bar *all race discrimination in contractual relations.* This list set forth in subsection (b) is intended to

be illustrative rather than exhaustive. In the context of employment discrimination, for example, this would include, but not be limited to, claims of harassment, discharge, ... retaliation." H.R.Rep. 102–40 at 92 (1991), reprinted in 1991 U.S.C.C.A.N. 549, 630 (emphasis added)

Simpson state that plaintiff never mentioned race, although he named certain drivers, who are white, who were receiving preferential treatment. There is some indication, however, that they could have inferred that he was referring to disparate treatment on the basis of race. Although many drivers complained of assignments, Simpson viewed plaintiff's complaint to Shirkey as a "slap in the face," implying that she might have viewed the complaint as an accusation of racial prejudice, and that plaintiff should be grateful for the work assignments he was given. However, that plaintiff was complaining of race discrimination was no longer in doubt when Shirkey and Simpson received the EEOC charge around January 28, 1997. It was at that time that defendant's retaliatory treatment became evident.

Plaintiff was initially given some hauls at the earlier part of February. Essie testified that after the EEOC charge plaintiff received fewer hauls or less profitable ones. Simpson also stated that she did not favor plaintiff with assignments after getting the EEOC charge. Simpson seemed perturbed by plaintiff's allegation. She stated that she just was not able to please plaintiff. Other than the complaint early in January and the EEOC charge, however, Simpson cannot point to any specific complaints made by plaintiff during that period of time until plaintiff no longer received any work. Plaintiff or Essie continued to call in regularly seeking hauls. They appeared to have completed the assignments appropriately and without incident.

Simpson's and Shirkey's frustration with plaintiff's action in filing an EEOC charge culminated in the events of March 17 and 18, 1997. On March 17, 1997, plaintiff, Essie and Dennis Qualls (another African–American driver) were instructed to go to a barge to load. It started to rain and they were unable to finish the load that day. They went back to load on March 18th. However, when they got there, they were told to call Simpson. The three understood that pursuant to practice and policy, they did not have to call the dispatcher until the load was completed. Simpson, however, stated that because they failed to call in at the end of the day (on March 17th) she assigned three drivers to be at the barge the next day. All three drivers were white. Plaintiff, and the other two African–American drivers were, therefore, denied the opportunity to complete the load. They had to return to Pine Bluff while the three white drivers were allowed to remain.

Plaintiff continued to call to seek work after March 18th. However, Simpson and Shirkey determined that they would not assign plaintiff any more hauls, ostensibly because of his failure (or the failure of Essie) to call in to the office at the end of March 17th.

Defendant's rationale for failing to give plaintiff more work cannot withstand scrutiny. First, there appears to be some dispute as to what the policy actually is concerning barges. In any event, there is no written policy setting forth any requirement. Plaintiff stated that he had worked a barge haul the month before and did not call in until the job was completed. Other witnesses testified that there was no mandatory requirement that a trucker call in daily when working barge hauls. Second, Simpson was aware that plaintiff had not completed the load the afternoon of March 17th and would need to do so on March 18th. Third, Simpson's and Shirkey's decision to refuse to offer any further work to plaintiff because of the minor infraction of not calling in strikes this Court as overkill. Defendant was not in any way injured or harmed by plaintiff's failure to call in. The work would have been done; the customer would have been served. Furthermore, as discussed above, the policy concerning the necessity of calling in was equivocal at best.

It is clear that Shirkey and Simpson were looking for a way to "get rid" of plaintiff, a driver who was, in their minds, causing unnecessary problems. Of course, the only problems he had caused since January were in complaining once to Shirkey, refusing a load which Simpson considered profitable, and filing an EEOC charge. Refusal of a load certainly cannot justify termination. Both Shirkey and Simpson stated that it was not uncommon for drivers to refuse to accept what they consider an unprofitable run. Shirkey stated that at least 90% of the drivers did so. Simpson stated that she did not hold it against a driver when he or she refused a load. She later modified that to

say that she didn't hold it against the driver if the driver handled it in a proper way. Simpson did not state what the "proper" way is. Plaintiff however, in refusing the load, did not appear to do anything "improper" or untoward. Nor is there any evidence that plaintiff continued to complain to Shirkey or Simpson after the January 13th incident or, as Shirkey claims, tell her how to run the business.

Shirkey also stated that after plaintiff filed the EEOC charge, he had an "attitude." Again, there is no evidence that plaintiff did not perform adequately or acted in any inappropriate or hostile manner. He continued to call in seeking hauls; he continued to complete the hauls assigned. Simpson stated that plaintiff's work performance was about the same as other drivers.

Similarly, Shirkey stated that she understood there was a "scene" at the barge on March 18th. The evidence does not support Shirkey's assessment. In any event, she never spoke to plaintiff to find out what happened.

Further supporting plaintiff's contention that defendant's termination of his assignments is retaliatory is defendant's treatment of the two other African–American truckers from Pine Bluff. Nathaniel Hughes testified that he has not received any work from defendant since March 18, despite making numerous phone calls and office visits requesting hauling assignments. Each time Hughes was told that there was no work available.

*Damages*

■ Plaintiff seeks $335,407.20, in actual damages and an equal amount in punitive damages. The evidence does not support such a large award. Plaintiff's 1996 federal tax income shows a gross income of $113,628, with business expenses of $84,821, leaving a net profit for 1996 of $28,807.00. Plaintiff received hauling income of $81,370.78 from defendant in 1996, of which $72,879.30 was earned in the last six months of 1996. Furthermore, the evidence reveals that plaintiff continued operating his trucks through other brokers after March 18, 1997. Essie estimated that plaintiff earned about $50,000.00 since being terminated by defendant. In a bankruptcy petition filed on April 10, 1997, plaintiff stated that he was grossing $10,-000.00 per month through his trucking operating with business expenses of $7,387.55 per month which would leave a net annual income of $31,349.40. Thus, it does not appear that plaintiff has been damaged to a substantial degree by the retaliation. Indeed, the bankruptcy action filed less than one month after he was terminated from defendant does not appear to be wholly caused by the termination, in that plaintiff was working elsewhere and he had, at least for some period of time, earned money from defendant in 1997.

The Court finds, however, that plaintiff did lose some income due to the retaliation, in particular after defendant received the EEOC charge and for a short period of time after plaintiff was terminated. The Court is of the opinion that plaintiff is entitled to compensatory damages in the amount of $2,500.00 representing the lost income as a result of the retaliation.

■ The Court is also of the opinion that plaintiff is entitled to punitive damages. In retaliating against plaintiff for complaining about race discrimination, the Court finds that defendant was callously indifferent to plaintiff's rights to attempt to remedy what he perceived as a discriminatory situation. The Court further finds that defendant was motivated by a malicious motive in terminating plaintiff, that is, it wished to rid itself of a "problem" of people complaining about race discrimination and seized upon a relatively innocuous situation to do so.

The evidence reveals that defendant does over $8 million in business contracts annually. It has over $460,000 in retained earnings for the year 1997, and has a gross income of $650,000. Its greatest expense is almost $400,000.00 in salaries (for the four employees). The Court, therefore finds that plaintiff should be awarded punitive damages in the amount of $8,000.00.

Accordingly, the Court finds that plaintiff is entitled to judgment on his retaliation claim against defendant. He is awarded $2,500.00 in compensatory damages and $8,000.00 in punitive damages. His race discrimination claim is hereby dismissed with prejudice. The claims of Essie Fitzgerald

against defendant are hereby dismissed with prejudice.

IT IS SO ORDERED.